### L. B. BUTNER v. BROWN BROTHERS.

(Filed 21 December, 1921.)

**Negligence — Evidence— Nonsuit—New Action—Second Appeal—Appeal and Error.**

It appearing in this case, involving the question of defendant's negligence, that a motion of nonsuit on the evidence has been affirmed on a former appeal (180 N. C., 612), and another action has been brought between the same parties for the same cause, and again nonsuited upon substantially the same evidence, the Superior Court having followed the former decisions of the Supreme Court in the former action, the judgment is affirmed on the appeal in the subsequent action, for the reasons stated in the former decision.

CLARK, C. J., dissents.

APPEAL by plaintiff from *Shaw, J.,* at the August Term, 1921, of YANCEY.

Civil action to recover damages for physical injuries suffered by reason of the alleged negligence of defendant company, its agents and employees, in operating a lumber mill. At close of plaintiff's evidence, on motion, there was judgment of nonsuit, and plaintiff excepted and appealed.

*Charles Hutchins and A. Hall Johnson for plaintiff.*
*Watson, Hudgins, Watson & Fouts for defendant.*

HOKE, J. This cause was before the Court in a former appeal, and it was there held that the defendant's motion for nonsuit should have been sustained. This opinion having been certified down, judgment of nonsuit was formally entered pursuant to the opinion. Plaintiff then

instituted present suit to recover for the same injury and at close of plaintiff's evidence, on motion, a judgment of nonsuit was again entered and plaintiff excepted and appealed.

On perusal of the present record and a careful comparison with the facts set forth in the former appeal, we are of the opinion that the two actions are made to rest on substantially similar facts, the questions presented are substantially the same, and for the reasons set forth in the former opinion we must hold that the judgment of nonsuit has been properly entered. There, as in this case, the plaintiff at the time of his injury was in the mill getting some edgings, contrary to the rules of the company, contrary to the explicit instructions of his own father, and acting on the invitation and by the directions of one Joe Rischell, a subordinate employee, having no authority, express or implied, to bind or charge the company in this matter by his words or by his conduct. A statement of the pertinent facts and the authorities upon which the ruling is based will sufficiently appear by reference to the former case, reported in 180 N. C., 612. The judgment of the court is

Affirmed.

CLARK, C. J., dissenting: This case was here before, 180 N. C., 612-619. The action is by the same plaintiff against the same defendant, and and for the same cause of action. The plaintiff, who, it appears from the uncontradicted evidence in this appeal, was 11 years old when injured, recovered on the former trial a substantial verdict and judgment. On the former appeal it was held by the majority opinion that the verdict should be set aside and the cause dismissed as on motion of nonsuit. On such judgment, from time immemorial, the plaintiff has had the right to bring a new action for the same cause to strengthen his case if he can do so, and he truly claims that he has done so as will appear by comparing the testimony on this occasion with that offered on the former trial.

It is true that a second appeal in the same cause will not be entertained. But this is not that case. Here there is an entirely new action, and the plaintiff also contends there is much additional testimony which negatives the objection that the evidence now before the court is substantially the same as on the former trial. Besides, the plaintiff on this appeal presents exceptions for the rejection of testimony which were not presented before, and which, if admitted by the court, as it should have been, would have made a material difference in this trial.

On the former trial, as in the present case, there was evidence, which must be taken as true on a motion of nonsuit, that the plaintiff Earl Butner, who sues by his next friend, was a boy 11 years of age at the

time of his injury, and that prior to his injury he had worked in the defendant's mill a month or more, having been employed by the defendant company in violation of the laws of this State. There is the testimony of Lonus Butner, the boy's father, p. 17 of the record; of Miller, p. 21; Honeycutt, p. 23; McKinney, p. 23; Garrett Honeycutt, p. 25, and of Earl Butner himself, p. 27, and other witnesses, that the plaintiff, together with other small children were in the habit of playing all over and through the plaintiff's band mill, and that it was their custom for the boys to get strips at the very place where the young boy was injured; that the management of the mill knew of this custom and had made no objection. The testimony of several witnesses is that children would be in the mill getting strips at the live rolls every day *at the exact place* where Earl Butner was injured, and that there were no notices for children to stay out; that the custom was so general for children to be in the mill and all through it and to get strips where Earl got them that it was generally recognized. It was also in evidence, which must be taken as true on the nonsuit, that when Earl and other small children would be in there getting strips, at the place where Earl was injured, the mill foreman would be in there sitting around in the mill, and would raise no objection to this custom.

It was also in evidence that the defendant company owned this large band mill with 25 tenement houses immediately around the band mill, where the employees of the mill lived, and that at the place where the plaintiff was injured there were live rolls or cogs which were only protected on the top and half way down by the covering. The evidence on this occasion is much fuller as to the absence of the covering than on the former trial. It shows that the saws were running just about the height of the boy's arm when standing up, and that the covering only came down half-way the side of the dangerous machinery or cogs so that he did not, as argued before, have to come up under the machinery to be injured, but was in fact injured because his elbow was caught by the cog when he was in a natural position picking up the strips. The boy, 11 years old, according to the testimony, was sent on the day of the injury to get the strips which the foreman and the superintendent of the mill had promised his father should be thrown out. This had not been done, and when Earl came in, as usual with children, Rischel, who was in charge of the mill at that point, motioned to him to come in and pointed to the strips. Earl went to the place thus shown him, and where he and the other children had been accustomed to go to get the strips, and while getting them his arm was caught by the live rolls of cogs, not underneath

the machine, but *on the side,* about the heighth of his arm and where the cogs were entirely unprotected, and his arm was so mutilated that it had to be amputated near the shoulder.

Among the differences from the evidence on the former appeal, it may be noted that the age of the boy, when injured, was stated, in the opinion of the court, to have been 12 years, and on this trial the testimony, which must be taken as true on the nonsuit by the trial judge, is not only that he was only 11, but this testimony is now uncontradicted. Besides, there are several exceptions and assignments of error which did not appear on the former trial:

1. The court erred in sustaining the objection to this question and excluding the evidence, "What was the custom, if there was any custom, for boys to get strips right at the place where Earl was hurt?" The plaintiff should certainly have been permitted to show, as alleged in his complaint, that the custom had long existed, without restriction, for children to get strips at the *exact place* where this child was injured. This is alleged in the complaint (paragraph 4) as one of the causes of action, and the plaintiff was entitled to ask the question to prove it. If, as alleged, and as the plaintiff offered to show, there had been unrestricted custom for children to get strips at that place, it was material evidence tending to show that the proximate cause of the injury was the negligence of the company.

2. Exception two is that the plaintiff asked the witness Riddle, "What, if anything, do you know about a custom for children to play in the mill and get strips in the mill?" which was answered by the witness: "They went through there and got strips." This answer was stricken out "because the boy (Riddle) was not there until after the injury." This witness stated that he was in the mill before Earl was hurt, but did not work in that place, but would go in there after the mill was closed down; that he worked at slabs outside, and went in after Earl was hurt. Riddle evidently meant that on that day he did not go to the place where Earl was hurt until after the injury, and it was surely competent for him to say that children as a custom went through the mill, though he was not in that room until after the injury to Earl. He was competent to testify as to the custom, which he stated, being an employee in the mill, and his testimony should not have been stricken out simply because he was not present at the exact moment that Earl was injured.

3. The witness McKinney was asked, "What do you know of the continuance of the custom for children to play in the mill?" This was alleged in the complaint, and was a most pertinent question and a most material circumstance which the plaintiff was entitled to prove by this witness, and it was error to exclude it. The plaintiff was entitled to place before the jury the long-continued custom of the defendant, that

the children had been allowed, without restriction, to play around highly dangerous cog-wheels, which were insufficiently protected.

4. The defendant also excepted and assigned as error that when the plaintiff asked the witness, "State whether or not there was any general custom for them (children) to get fuel at the live rolls?" on objection by the defendant the witness was not allowed to state what was the general custom in this respect.

The exclusion of these questions, tending to prove that there was a general custom by the defendant to allow children in the mill, and to get strips at that place, was erroneous, and tended seriously to hamper the plaintiff in laying the facts alleged in his complaint before a jury in order to show that the negligence of the defendant company in this, as well as in other respects, was the proximate cause of the injury, and to negative any allegation of contributory negligence by this 11-year-old boy, who was getting these strips as he and other children of that age had been long permitted to do by the company without objection; that he went in on this occasion not only at the invitation of the man who was operating the machinery, but according to the custom of the company, or those managing it, who had permitted children to do this without restriction. This fixes the responsibility on the company irrespective whether Joe Rischel had authority to invite the plaintiff to come in and get the strips on that occasion or not.

But irrespective of the great harm which accrued to the plaintiff by the refusal to admit the above evidence, even upon the mutilated evidence admitted the case should have been submitted to the jury, and it was error to direct a nonsuit.

In brief, the evidence in this case, which comes before the Court upon its own merits, for it is a new action, and not another appeal in the same case, is as follows: The father testified that the boy was 11 years old when injured, at 7:30 a. m., 16 March, 1918, in the mill of the defendant. He testified he met the foreman of the company one night near the mill and asked him if he could get some strips at the mill. The foreman replied that he could get all he wanted, the witness then asked him who handled the strips and worked at the edger table, and the reply was, Rischel. The witness then went to Joe Rischel and asked him to throw out some strips, and he replied that it would be all right. Some days thereafter when the mill started up he again mentioned the matter to Rischel, who told him that he would throw out some strips, and the next morning he sent his son Earl down to get them, but told Earl not to go into the mill for them. When asked if he knew of any custom existing at the mill for boys to go in, the defendant objected, but the court overruled the objection, and the witness answered that he did and he had noticed the habit of boys being in the mill. He though there

was danger in it, but, it was the custom. This witness also stated that he had seen boys getting strips occasionally where Earl was afterwards hurt; that sometimes he would be at the mill once a week, and he had seen them there several times; that he had seen boys all through the mill; that they would go all through the mill everywhere; that he had a picture that describes the place where Earl was hurt, but, it was the picture of another mill, and was admitted by the court only for purposes of illustration and not as evidence in this case. But the witness was permitted to add that the machinery in the picture was similar to that used in this mill. The witness further stated that the place where Earl was standing was at the first live roll in the front of the picture, standing at the edge of table on the left of the edger, at the first live roll. This answer was stricken out, because the witness later admitted he did not see his son at the machine, at the moment when he was hurt. The witness further stated that though he was in the mill often he had never seen any notices forbidding children to come in. This witness further described the machinery as follows: "These live rolls revolve at right angles, and the two cog-wheels under the edge of the table made the rolls move; one cog-wheel was on the live rolls and the other revolved in the cog-wheel next to it; then there was a hood made of steel that came over it on top and *partly down the sides;* if any one sat down on top of that, his pants might be drawn into it and you would not have to get up under the wheel to get caught, but it has got to go under there before it could get to the cogs. *The housing comes down half-way on the sides.* He further said that he had seen signs in the mill not to smoke, but if there were any signs up to keep children out he did not know it. He testified that, Joe.Rischel pointed out to him where Earl was hurt, and that it was at the first live roll in the picture. On cross-examination he said· again that the covering came down *over the cog-wheels about half-way;* that there were 20. or 25 rental houses about the mill in which the renters lived, and that Earl worked in this mill before he was injured and .when he was 11 years old. He further testified without exception, "The cog-wheels were about half covered, that is, all over the top and *half-way down the sides;* Earl pointed out where he was hurt after he came back from the hospital. Arthur Brownie, the foreman, told him that he would have the strips thrown out, but he did not do it. Anyway they were not out there when Earl went down for them. At the Rutherford Hospital they cut off his son's arm. The witness was asked what were the expenses he paid at the hospital and the doctor's bill, and did the lumber company pay any part of these expenses, but on the objection of the defendant this evidence was excluded, as was also the question as to Earl's present health, and the plaintiff excepted.

The witness Miller also testified at the trial (in August, 1921) that he would be 16 next April (1922), and that he was working in the mill in 1918 when Earl Butner was hurt, and that he had worked for the defendant company before that, and had seen other boys working in the mill just about his size; that he had seen boys in the mill, often, at different places; that he knew where Earl was hurt, and had seen boys playing nearly all over the mill; that he had seen boys picking up edgings where Earl was hurt, and had gotten strips there to build a fence with; that this was the only place there to get them; they came through the edger and would be pitched off at the end of the mill; that he had gotten strips where Earl was hurt.

Alex. Wilson testified that he had seen children come in there; that he had seen children up on the dock where the boy was hurt; that some of the children he had seen in there were 5 to 7 years old; that if a boy stood close enough he might be jerked into this machine; that he had seen all sizes of children there from ten years on up; that he does not know anything about children being put out of the mill by the foreman; that he never saw it done.

Dock Forbes testified that he had seen boys in the mill, about 11 years old, but does not know whether they were playing. He also testified that he did not know anything as to notices about children, but there was a notice up not allowing smoking, but would not say there was such a notice as to children staying out.

Orville McKinney testified that he lived there before Earl was hurt, and was often in the mill, and children were in there 7 years old and up during the day, any time they wanted to go in; that he never saw any notice for children to stay out.

Garrett Honeycutt testified that he had seen children in there; going backwards and forwards through there, 8 years old and up, most any time during the day; that if there was any notice as to children staying out he did not see it, and when children were in the mill they would go most any place they wanted to. He ran the slasher in the mill and saw children in the mill. Charlie Forbes testified that he was not about the mill much, but had seen children going through the mill, 7 years old up.

The plaintiff, Earl Butner, testified that he was hurt 18 March, 1918, when about 11 years old. He worked in the mill before he was injured; that he went to the mill to get strips the day he was hurt; that he did not find the strips outside, and Joe Rischel was in charge of the machinery where he got hurt that day; that when he went for the strips Rischel was standing at the dock and motioned for him to come up into the mill; that he went up and Rischel took him around and showed him where the strips were and told him to get in there and get them, that he was busy; plaintiff went to get them and pulled out several. He

grabbed hold of one and it was pretty tight and he gave a jerk and it pulled out and his sleeve got caught in the cogs; that he saw children in the mill just about every day. They would be in there getting strips every day where he was hurt; that he never saw any notice to children to stay out. The court refused to allow him to answer the question whether he had played in the mill before, but to the question whether he had ever been in the mill before, he was allowed to answer, "Yes, sir; about every day; that the reason he quit carrying water in the mill was that his father stopped him to go to school; that no one ever led him out of the mill; that the foreman (Brownie) never led him out in his life; that they never tried to keep him out of the mill; that the cogs where he was hurt *were covered top and about half-way down the sides;* that when he pulled the strip his arm did not go up but it must have went into it; that his father had told him to stay out of the mill three or four times; that he was 11 years old then; he said he had got strips at this place before, and that when he got them there was not any objection; that when the boys would get strips at that place the foreman of the mill was there sitting around, and he never had seen him raise any objection." The plaintiff also put in evidence the part of the answer admitting that the foreman had promised the plaintiff's father to throw out the strips.

The rule is without any exception, that on a judgment of nonsuit as in this case the evidence for the plaintiff must be taken in the most favorable aspect with the most favorable inferences to be drawn from it, excluding the evidence for the defendant, for the reason that the judge cannot as a matter of law decide what part of the evidence the jury might or might not believe; and, therefore, the evidence for the plaintiff on such motion must be taken in the most favorable aspect for the plaintiff.

The evidence in this case, mutilated though it may be by the exclusion of the evidence which was offered by the plaintiff, and which exclusion he has assigned as error, still leaves enough to show that the plaintiff was entitled to have this case submitted to the jury. This is not the same case that was here before, but is a new action, and there is much evidence which was not before presented or discussed.

The evidence before us, taken to be true, as it must be on this appeal, and, indeed, there is no contradiction of this, shows that the boy was only 11 years old when hurt; that he had worked in the mill prior to that time, though it was a violation of law by the defendant; that children from 7 to 8 years old up had been customarily allowed to roam through the mill, and there were no notices up forbidding them to do so; that the foreman or manager (Mr. Brownie) knew of this fact; that boys, and, indeed, the plaintiff himself, had been allowed to get strips

from this edger to the knowledge of the foreman, who was sitting around, and that he never objected to the plaintiff or other boys getting them; that the father of the plaintiff got permission to send his son down there to get these strips, and the foreman promised to have them thrown out for him; the plaintiff's father told him not to go into the mill on that occasion, but the strips not being thrown out, he mentioned his errand to Rischel, who told him to come in and get them, and showed him where to get them; that having been in the habit of going into the mill, and he and other children having gotten strips at that place before, he did so; that the cogs or live rolls, as they were called, on this machine were covered on top, but only half-way down on the sides; and the plaintiff, in pulling out one of the strips, which was stubborn, had his arm jerked sidewise into the uncovered half of the cogs; that he did not come up underneath the cogs, but his arm was *jerked sidewise into them.*

There was overwhelming testimony, by numerous witnesses, that children from 7 and 8 years old up were customarily allowed to go throughout the mill, and there was also ample evidence that there were no notices forbidding the children to do so, though there were notices against smoking. Surely this evidence required the submission of the case to the jury upon the evidence of negligence on the part of the defendant as the proximate cause of the injuries sustained by this 11-year-old boy, who, as he had theretofore been permitted to do, and as other children had been permitted to do, and upon the express invitation of Rischel, and by the implied invitation of the mill manager, went into the mill on this occasion to get the strips, and who lost his arm by reason of the dangerous cogs revolving at a high rate of speed being covered *only half-way down the side,* and his arm was jerked sideways into the cogs. He says he did not go under the machine, and his statement must not only be taken as true, *but there is no evidence to the contrary.*

We have numerous cases that clearly sustain the plaintiff's right to recover, among them: *Harrington v. Wadesboro,* 153 N. C., 437; *Ferrell v. Cotton Mills,* 157 N. C., 528; *Benton v. Public Service Corp.,* 165 N. C., 354; *Starling v. Cotton Mills,* 168 N. C., 230; *Ragan v. Traction Co.,* 170 N. C., 92; *Kramer v. R. R.,* 127 N. C., 328, and cases cited in Anno. Ed.

This Court has established the doctrine that the defendant may be held liable in cases where the negligence of the defendant and of a fellow-servant concur in producing the injury. Upon the same theory, a corporation of this kind may likewise be held liable where its negligence and the negligence of its servant, whether he had authority to bind the defendant or not, concurred in producing the injury.

Its foreman sat around while young boys like the plaintiff were near to the dangerous machinery, getting strips every day, and made no

objection.   In the presence of this negligent foreman and superintendent, the employees seeing this custom going on every day could not be expected to be more careful than their superiors.

This 11-year-old child, who lost his arm at the shoulder, was entitled at least to a jury of his country to pass upon the above evidence tending so strongly to show that the negligence of the defendant was the cause of his irreparable injury.   Indeed, there is not a scintilla of evidence that this child contributed in any way to his own injury, or was guilty of any negligence.

There is evidence that the injury was caused by the unprotected cogwheels and the long-continued custom of the defendant to permit children of tender years to roam through the mill at will, and without objection to get strips at this unprotected and dangerous machine.   Certainly it cannot be said that there was *no evidence* to that effect, and that is the question here.

> "The sob of the child in its helplessness,
> Curses deeper than the strong man in his wrath."