## Anderson v. Reading Company.

*Edwin A. J. Blank*, for plaintiff; *William Clarke Mason*, for defendant.

MARTIN, P. J., Aug. 12, 1930.—This is an action of trespass brought by the plaintiff against the defendant, on behalf of herself and two minor children, Lenora Anderson and William Anderson, for damages by reason of the death of her husband, William Anderson, by accident, on Feb. 14, 1925, due to the alleged negligence of the defendant. Trial was had and a verdict directed for the defendant on the ground that plaintiff had failed (1) to establish negligence on the part of defendant, and (2) failure to show how the deceased happened to fall.

Plaintiff has moved for a new trial on the ground that the trial judge erred in giving the jury binding instructions for a verdict in favor of defendant. The other reasons filed on the motion before us go to matters that are not for the consideration of the court, in view of the fact that the verdict as directed by the court is a question of law.

Had the evidence been submitted and had the jury taken a view favorable to the plaintiff from all the testimony and inferences to be drawn therefrom, they might have reached the following conclusions: That the deceased was, on Feb. 14, 1925, at about 10.30 P. M., walking northeastwardly on Gurney Street, in the City of Philadelphia, on the brick sidewalk on its northeasterly side, along which is an excavation twenty-five feet deep, the property of defendant. At the bottom of this excavation are defendant's railroad tracks, running parallel with said Gurney Street. There were no guard rails along this excavation with the exception of a short wooden fence, about twelve feet

long, which connected to a short iron fence attached to the bridge, which is a continuation of Somerset Street, crossing the sunken railroad tracks of the defendant. Somerset Street intersects the said Gurney Street. From the end of this wooden fence there was a space of about six feet to a telegraph pole adjacent to the brick sidewalk. This space was at the axis of the curve of the brick pavement and was the place where the decedent was last seen, and at this point the excavation came to within a few inches of the brick pavement, when there was an incline of about eighteen inches and then about a twenty-five per cent. fall, ending at the bottom of the excavation along which the defendant's railroad tracks were located about twenty-five feet below the surface of the street. The decedent was traveling on the pavement and preceding him were a man and woman together, and then a woman to the rear of him, making four people in all. These people were not far apart. That the night was dark and there was a drizzling rain and the lighting was not very good. That the deceased, who preceded the woman, disappeared as she cried out, "My God, a man just fell over this bank," and was no longer on the pavement, but was a few seconds later heard groaning near the railroad track. A few minutes afterwards he was picked up near the bridge abutment, bleeding, muddy and his clothes covered with mud and blood, and was found near the level of the railroad tracks "like a man breathing his last," and was recognized as the decedent. He was taken to the hospital and found to have a fractured skull, and the next day he died of a compound compressed fracture of the vault of the skull.

No one saw the decedent actually fall from the pavement to the tracks below. There is no evidence how he fell.

The first question to be determined is, Was there evidence to justify the submission to the jury of the issue as to the negligence of the defendant?

The evidence is undisputed that there was no guard rail between the wooden fence and the telegraph pole, a distance of about six feet, and at that point the bank of the railroad cut was within a few inches of the pavement and from that point gradually tapered along the westerly side of the pavement going south, to wit, in a "V" shape, the distance expanding going south.

The plaintiff's statement of claim sets forth in paragraphs three, four, five and six, as follows:

"3. Plaintiff named above avers that on or about the 14th day of February, 1925, there existed abutting the north side of Gurney Street, in the City of Philadelphia, a sidewalk adjacent to the tracks of the Reading Company, the defendant named above, upon which pedestrians for a long period of time, with full notice to the defendant, passed back and forth in an easterly and westerly direction.

"4. Plaintiff avers that the defendant above named, by its agent, servants and employees, for a long time prior to the occurrence hereinafter related, permitted said sidewalk to be unguarded without the erection of a post, fence or warning and could have and should have had notice of the dangerous and unsafe condition of the same at this point.

"5. Plaintiff avers that on or about the 14th day of February, 1925, William Anderson, husband of the plaintiff named above, was lawfully passing eastwardly on Gurney Street and about turning to go approximately north on Somerset Street when owing to the unguarded condition of the street at this point and without neglect on his part slipped and fell down the embankment between the bed of the railroad depressed below the level of the street and the aforesaid street, fracturing his skull and receiving other injuries resulting forthwith in his death.

322

"6. Plaintiff further avers that the aforesaid was caused solely by the negligence of the Reading Company, the defendant named above, and was not contributed to by any negligence on the part of the plaintiff."

The statement sufficiently charges the defendant with negligence in that it "permitted said sidewalk to be unguarded without the erection of a post, fence or warning and could have and should have had notice of the dangerous and unsafe condition of the same at this point."

It is the duty of the defendant company so to guard its cut adjacent to the highway as to protect it for the safety of persons or animals rightfully at or near it, and its failure so to do is negligence and renders it liable to a person who, without fault on his part, is injured as a result thereof.

"If the owner of land makes an excavation thereon adjacent to a highway or so near as to make the use of the highway unsafe or dangerous, he will be liable to a traveler who, while using ordinary care, falls into it and is injured:" 45 Corpus Juris, § 285, page 860.

"An owner of land may be liable to another person entering without permission where he makes changes in his land so close to a public highway as to put in danger a traveler who mistakes the course of the highway and, without fault on his part, inadvertently strays from it:" 45 Corpus Juris, § 282, page 859.

"The rule is well settled, as is shown also in the earlier note on this question in 26 L. R. A. 686, that an abutting property owner who makes an excavation on his premises so near an existing highway as to render travel thereon unsafe is liable for consequent injuries to one traveling on the highway who is himself in the exercise of due care. This rule is supported by uniform authority:" L. R. A. 1918 A, page 850.

"No person is at liberty to construct, maintain, or suffer a dangerous excavation on his premises in close proximity to a public way by which those lawfully using the public way and in the exercise of proper care may receive injuries therefrom:" Racine v. Morris, 136 N. Y. App. Div. 467, 121 N. Y. S. 146.

"A person responsible for a dangerous place or instrumentality must guard, cover, or protect it for the safety of persons or animals rightfully at or near it, and his failure to do so is negligence, rendering him liable to a person who, without fault on his part, is injured as a result thereof:" 45 Corpus Juris, § 295, page 869.

"The rule, as to responsibility of a landowner to passersby for excavations or other dangerous conditions on his property, deducible from a review of the authorities in this and other jurisdictions, is stated in our own case of Gramlich v. Wurst, 86 Pa. 74, where, quoting from Hardcastle v. South Yorkshire Ry. Co., 4 Hurl. & Nor. 67 (2 Bohlen's Cases on Torts, 199), possibly the recognized leading case on the subject, we said: 'When an excavation is made adjoining to a public way, so that a person walking on it might, by making a false step, or being affected with sudden giddiness, fall into it, it is reasonable that the person making such excavation should be liable for the consequences. . . .' " Hildebrand v. Director General, etc., 270 Pa. 86, 90; Grier v. Sampson, 27 Pa. 183; Grogan v. Pennsylvania R. R. Co., 213 Pa. 340.

"From the record it appeared that on the night of December 24, 1915, plaintiff's wife was killed by falling over the edge of a culvert or bridge into a ravine below. At the time of the accident plaintiff was walking ahead of his wife, and there was no eye-witness of her fall, nor was there any evidence as to how the accident actually happened. Along the edge of the bridge or culvert there was a rail with but a single stringer, over or under which a person

might fall or slip. There was evidence that a boardwalk existed more than four feet inside the rail. . . . The night was dark and the road was muddy:" Seamann v. Mifflin Township, 266 Pa. 56; verdict and judgment for plaintiff.

As to there being no eye-witness to the actual falling of the decedent, it is not essential where the proof may be furnished by the circumstances themselves, the test is whether they are such as satisfy reasonable and well-balanced minds that the accident resulted from the negligence of the defendant.

It is the duty of plaintiff "so to picture or describe the facts as to enable the jury to visualize the occurrence and form an independent judgment thereon:" Mack v. U. S. Gypsum Co., 288 Pa. 9, 11; Allen v. Willard, 57 Pa. 374; Tucker v. Pittsburg, etc., Co., 227 Pa. 66; Ferry v. Phila. R. T. Co., 232 Pa. 403; McManamon v. Hanover Township, 232 Pa. 439; Madden v. Lehigh Valley R. R. Co., 236 Pa. 104; Dannals v. Sylvania Township, 255 Pa. 156; Reardon v. Smith, 298 Pa. 554; Seamann v. Mifflin Township, 266 Pa. 56.

Plaintiff's testimony was as follows: "A. I saw four people, a man and a woman, and a man then, and another woman, and they were walking ahead of us on Gurney Street, going east. I did not pay any more attention to these people, only casually looked at them. I started talking to my brother-in-law again, and all of a sudden I heard a woman scream. We looked up and ran. She said, 'My God, a man just fell over this bank.' I said to my brother-in-law, I said, 'What will we do?' He said, 'Let us go down.' I said, 'I am game, if you are.' So we went down the bank. When we got to the bottom we found this man lying on his face on the bottom of the bank. . . . Q. Mr. Thompson, these people that you saw walking ahead of you—will you just state as to what position they were on the pavement when they were ahead of you? Where was the man and woman you testified? A. They were just going over the bridge. Q. And then who came next? A. The man. [This being the decedent.] Q. And then who came after him? A. The woman. Q. Was that the woman—is that the young girl you mentioned, the last one? A. It is. Q. So that the young girl was between you and the young man? A. Yes, sir. Q. The question has already been asked you—did you actually see the man fall yourself? A. No; I did not see him actually fall. Q. You did not see him actually fall? A. No, sir. Q. You heard somebody shout something? A. A woman. Q. A woman shouted, 'My God, . . .' A. There is a man fell down the bank. Q. Then you immediately went up to the place? A. Yes; the man was gone. Q. The man was gone? A. He was not there." (Testimony, pages 11, 12 and 13). See Exhibit No. 1.

"Q. Did you see this man before he went down? A. Yes, sir. Q. Where was he? A. Yes; I saw the man there. Q. Are you sure it was the man that went down? A. It must have been, because afterwards he was not there. Q. How do you distinguish him from the man that was walking ahead with the woman? A. Because he was a little short man. Q. The younger one? A. No; the other people." (Testimony, page 19.)

"Q. Had you known the man before that you found at the bottom of this gulley? A. Never saw him before in my life. Q. I show you a photograph and ask you to tell us what that is? A. That is the man that was laying in the hospital. Q. Is that the man that you picked up out of the gully? A. Yes, sir." (Testimony, page 23.)

The jury could fairly visualize the accident as hereinbefore set forth. There could be no other cause nor inference but that the decedent slipped, or was ill, or had a fainting spell and fell from the pavement into the cut. In any event the defendant would be liable. The decedent was on Gurney Street pavement

near the axis of the turn where the street enters the bridge; he was not on the bridge, but at or near the point where there was no guard rail.

There was no other traffic at or near the decedent except two people a short distance in front of him about to enter the bridge, and a woman who screamed, who was to his rear. The strong probability is that the accident occurred by decedent falling over the unguarded embankment, and thus came to his death, as no other reasonable theory is there to account for his death and none suggested by the evidence: Madden v. Lehigh Valley R. R. Co., 236 Pa. 104.

There was no testimony to rebut the presumption that the decedent exercised due care such as a prudent man would do, so that the question of contributory negligence does not appear in this case.

We conclude that there was enough in the evidence to justify the submission of the issues to the jury and that error was committed in giving binding instructions for the defendant.

And now, Aug. 12, 1930, the motion of plaintiff is sustained, the verdict of the jury is set aside, and a new trial is granted.